Filed 12/30/14  P. v. Goursau CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>LOUIE DAVID GOURSAU,<br><br>      Defendant and Appellant. | A136664<br><br>(Solano County<br>Super. Ct. No. VCR207781) |

A jury convicted defendant Louie David Goursau of 40 counts of child molestation against two girls under the age of 14 and the trial court sentenced him to 97-years-to-life in state prison.  He appeals claiming the denial of his motion for a continuance to secure additional witnesses, together with evidentiary and instructional errors require reversal of his conviction.  We affirm.

**I. EVIDENCE AT TRIAL**

***A.     The Prosecution's Case***

*1.     T.K.*

T.K. was 16 years old at the time of trial.  She grew up in Vallejo and lived in a house with her mother Aimee K., her older brother, and defendant, who had been her mother's best friend.  T.K. had known defendant since she was a baby and she called him "Uncle Louie."  When T.K. was sick, defendant helped out with meals and household chores.  T.K.'s friends came over to the house all the time, including her best friend, her "cousin" J.A., S.C., and her brother's friends.  J.A. was a very close friend and not a blood cousin.  J.A.'s father was a close friend of T.K.'s mother.  J.A. lived in San

1

Francisco and visited Aimee's home during the weekends and summers. S.C. was a neighborhood friend who lived four houses away and came over to T.K.'s house every day. J.A. and S.C. were two to three years older than T.K. Aimee was not always home when J.A. and S.C. were there. Aimee was often at work or at her boyfriend's house; she was gone overnight about three or four days a week.

Between the ages of 9 and 12, defendant took care of T.K. at the house when her mother was away. Her mother's friend Rhonda also lived at the house from time to time, but defendant was always there. There were times when T.K., S.C., and J.A. were left alone with defendant.

When T.K. was 8 or 9 years old, defendant started doing inappropriate things to her. Defendant touched her vagina. T.K. thought it was a game and did not think there was anything wrong. No one had ever done anything like that to her before. It did not always happen in the same room in the house, sometimes it would occur in the living room and downstairs in the basement and maybe in the laundry room. T.K. indicated that the touching would happen sometimes when she was with J.A. or S.C. and sometimes when she was alone with defendant. Defendant touched T.K. under her clothing and would fondle her vagina. She believed defendant inserted his finger into her vagina because she had flashbacks of this type of touching, but she could not remember for sure. T.K. testified that the number of times defendant touched and fondled her vagina happened "too many times to remember. Too many to count." It would happen "pretty much every time we were left alone." T.K. was left with defendant alone "pretty much every day" from age 8 until she was 12 years old. She believed defendant would touch her in this manner almost every day. T.K. recalled that J.A. or S.C. were there most of the time, but the molestation did not happen when all three of them were in the same room.

When T.K. was 10 or 11, she told her brother's best friend about the molestation, who in turn informed her brother. As far as she knew, no one else knew about it. T.K. did not alert any adults because she was scared of what would happen. She was also worried about how her mother would feel. Defendant did not threaten her, but he made it

2

clear to T.K. not to tell anyone. The molestation stopped when T.K. was 12; defendant told her, "We have to stop doing this because [S.C.] is going to tell."

T.K. testified that defendant "used to make me give him oral, and he used to give me oral." Sometimes it would happen at the same time when defendant was touching her. Defendant would lock the door and shut the blinds, and play a pornographic video in the living room. If someone would come in, defendant would quickly switch from the VCR to the television so it would appear that they were just watching television. When they were watching the video of people having sex and giving oral to each other, defendant would ask T.K. to orally copulate him, saying "come on, do it, do it," to which she would respond "no." This type of incident occurred more than once. Defendant would be wearing a shirt, with his pants down and shaking his penis. There were times where T.K. refused and other times when she submitted. T.K. stated that defendant had her perform oral sex a minimum of six times, one time occurring in the basement. When T.K. performed oral sex on defendant, sometimes he ejaculated and used a condom.

T.K. stated that defendant performed oral sex on her about eight times. Defendant would tell T.K. and S.C. to go into her room, and put on nightgowns and not wear any underwear. The acts would take place in the living room, lying on the couch, and defendant would do it to S.C. as well. T.K. did not think anything was wrong when she saw it happening to S.C. because it was happening to her too. T.K. indicated that the term "coloring" did not have a meaning for her in relation to defendant.

The girls would put on fashion shows, wearing T.K.'s mother's dresses and high heels, while defendant took photographs of them. He stored the photos along with pornographic videos in a locked chest that he kept in the basement. There was also a portable DVD player in the basement where defendant would play pornographic movies. Once or twice while watching one of the movies, defendant touched T.K. sexually.

In 2010, when T.K. was in eighth grade, she reported the molestation to her school counselor and the police were contacted. That same day, T.K. told her mother about the molestation. By this time, defendant had moved out of Aimee's residence. Prior to talking to her counselor, T.K. had spoken to S.C., J.A., and her best friend about what

3

had happened. She could not recall specifically what was said other than she and the other girls did not like defendant and they kept away from him. T.K. and J.A. agreed that they would not tell anyone until defendant died, so they would not have to go through the whole court process.

2.    *J.A.*

J.A. was 18 years old at the time of trial. She grew up in San Francisco. While growing up, J.A. visited her close family friend "Aunt" Aimee in Vallejo every weekend. T.K., her brother, and defendant were there. She called defendant "Uncle Louie." Aimee was not always present during her visits and defendant would watch the children when Aimee was away. T.K.'s friends, including S.C. who lived a couple of houses away, would come over.

J.A. testified that when she was 11 years old, defendant touched her inappropriately while she was in Aimee's living room. T.K. was there. Defendant would put pornography on the television and would make the girls do what the people in the movie were doing. Among other things, the movies depicted acts of oral sex. Defendant would pull down his pants and make them "jack him off" by touching his penis. He sometimes put on a condom and had an erection. When this was happening, T.K. was in the room. Defendant would make T.K. engage in similar acts. J.A. was not present when defendant did things with S.C.

J.A. maintained that defendant made her put her hands on his penis "maybe 20 times or more," at a minimum 15 times. She also had to perform oral sex on defendant maybe seven or eight times. Defendant would put on a pornographic movie and tell them to copy what was going on in the movie. He would wear a condom. She saw T.K. being made to perform oral sex on defendant about seven or eight times. Defendant orally copulated J.A. a minimum of 15 times. T.K. was sometimes there and defendant would do the same thing to her. J.A. stated that defendant would rub her chest when he was doing other sex acts.

J.A. testified that defendant digitally penetrated her vagina at least ten times while T.K. was present. This type of touching also occurred on two or three occasions when

4

she was alone with defendant. Sometimes all three sex acts (touching his penis, oral copulation, and digital penetration) would happen at the same time, and T.K. would be there. The acts took place in the living room and in the basement. J.A. said defendant would also suck her toes. At times, defendant would make J.A. and T.K. dress up in lingerie and take photos of them with a Polaroid-type camera. The lingerie was kept in a chest in the basement. When defendant wanted the girls to engage in sexual acts, he would refer to the activity as doing "coloring."

The molestation went on for one-and-a-half years to two years. J.A. was pretty sure that he told them not to tell anyone or they would get in trouble. She did not report the molestation to any adults. J.A. never spoke to S.C. about the incidents, but sometimes she talked about it with T.K. J.A. could not recall exactly what she and T.K. talked about.

The police contacted J.A. after T.K. told her school counselor that she had been molested by defendant. Aimee told J.A. that a detective would be contacting her. J.A. was interviewed by Detective Whitney. J.A. was 16 at the time of the interview. When Detective Whitney asked J.A. if she had been staying out of trouble, J.A. replied that she had. At trial, J.A. admitted that a few months prior to the interview, in January 2010, she had stolen property from Nordstrom's and one month after the interview, she had stolen property from Macy's.

3.	S.C.

S.C. was 19 years old at the time of trial. She grew up in Vallejo and went over to T.K.'s house often. T.K. lived with her brother, mother, and defendant. S.C.'s and T.K.'s friend J.A. would come over occasionally. S.C. stopped going to T.K.'s house when she was 15 years old, when she realized what was going on was wrong. She stated that defendant touched her and T.K., and took videos of them. S.C. recalled the touching began when she was 11 years old and it happened more than one time. S.C. went over to T.K.'s house "almost every day." Defendant would do something inappropriate whenever Aimee was not around. Aimee was not home at least half the week, and defendant was left in charge.

5

The molestation began when defendant encouraged the girls to run around naked; he helped them take their clothes off and sometimes videotaped them. T.K. was there but no adults were around. Defendant had the videotapes in a black chest where he kept his old-style camera. The chest was kept in the basement. He took photographs of T.K. and S.C. doing fashion shows. It was defendant's idea that S.C. wear a white fur coat without a shirt underneath.

S.C. testified that defendant touched her breasts and her vagina. The molestation happened in T.K.'s room; T.K. would be there and S.C. would be lying on T.K.'s bed. Defendant touched S.C.'s vagina with his hand and also digitally penetrated her. The touching first occurred when she was 11, and it happened at least twice. Defendant touched her breasts more than twice. The incidents occurred in T.K.'s room, the living room, the loft in the garage, and downstairs in the basement.

Defendant would have S.C. and T.K. watch porn in the living room. Sometimes he would try to do what was depicted in the movies. Defendant took videos of the girls and told them to "show your private parts." S.C. exposed her breasts and vagina. When S.C. was 11, defendant got on top of her and tried to penetrate her vagina but did not get his penis in all the way. He tried to do this three times. Defendant had T.K. orally copulate him in S.C.'s presence. She had seen that act on the videos that were shown. He did not try to get S.C. to do that act on him. During the times when the molestation was occurring, J.A. was not present. Nobody else was home when the sexual acts were happening.

At that time, S.C. did not tell anyone what was happening. T.K. told S.C. that she had spoken to a school counselor and since it had happened to S.C. also, S.C. should just come forward. Soon after, S.C. was contacted by Detective Whitney.

4.   *Aimee K.*

Aimee K. testified that defendant began living with her and her children in 2001. Defendant had been her best friend and helped take care of her children on and off since they were born. Aimee would leave her children with defendant almost every day so she

6

could go to work. Sometimes S.C. and J.A. would be at the house visiting. J.A. often spent the night, especially in the summer.

Aimee had been best friends with defendant since she was 17 years old. In all of that time, she had never seen him act inappropriately around any children. Aimee was contacted by T.K.'s school counselor who told her T.K. had something to tell her. T.K. could not tell Aimee what was going on, so T.K. wrote down on a piece of paper that defendant used to touch her. Aimee was very upset and soon after spoke with Detective Whitney. She never learned the exact details of what had happened to T.K.

Prior to finding out from T.K. about the molestation, Aimee had been given access to defendant's storage locker and had been there on occasion. She saw it contained many of defendant's belongings that he had previously kept in the house, including his video recorder and video cassettes. The items were scattered all around the storage unit.

Following his arrest, Aimee confronted defendant at the county jail. She asked him, "how could you do this to my daughter?" Defendant at first did not respond. When Aimee asked defendant, "did you let T.K. give you head," he replied, "yes." Defendant then said that "[t]he girls started it," "[t]hey did it first." In disgust, Aimee slammed the phone down against the glass partition several times, swore at defendant, and left.

5. *Detective Whitney*

Vallejo Police Detective John Whitney investigated the case involving defendant. He individually interviewed the girls, first T.K., then J.A., and S.C. After speaking with T.K.'s mother, Detective Whitney obtained a search warrant and investigated defendant's storage locker in the public storage facility. Officer Whitney found the storage locker empty.

7

**B.     The Defense Case**

    *1.     Shannon Goursau*

Defendant's son, Shannon Goursau,[1] testified that he stayed in Aimee's house anywhere from three months to one year, when T.K. was 12 years old and defendant was also living there. Shannon had a daughter who was the same age as T.K. Shannon and his father both slept in the living room. The basement was used for storage. While staying at the house, he often saw T.K.'s friends, S.C. and J.A., there. Shannon never saw anything unusual between his father and the girls, or any inappropriate behavior. The girls never seemed fearful of defendant. T.K.'s father also occasionally spent a few days at the house. There were people coming in and out of the house all the time. Aimee was not always around and did not spend personal time with T.K. when she was at home. T.K. would cry for her mother to come home. When he learned about the allegations against his father, Shannon was blown away, completely shocked. He brought defendant to the police department. Shannon did not ask defendant if the allegations against him were true.

    *2.     Michael Torres*

Michael Torres, defendant's friend of 40 years, visited defendant when he lived at Aimee's home on a weekly basis; he knew Aimee and her children. Defendant was like a roommate, had a separate room, and often watched the children and took care of the household. One time, Torres saw T.K., her brother, and another teenage girl watching some pornography in the loft above the garage. Torres took the pornographic video away from them. He believed the incident occurred in 2008. When Torres learned about the allegations against defendant, he was shocked. He has never seen defendant act inappropriately around children. Torres had always trusted defendant and considered him an honest person.

---

[1]     We shall refer to members of the Goursau family by their first names for purposes of clarity and intend no disrespect.

### 3. Mavis Austin

Mavis Austin lived across the street from Aimee's home and has known defendant since 2003. For three years, she went to Aimee's home practically every day. She described defendant's role in the household as a co-parent. Austin saw J.A. at the house frequently and S.C. almost on a daily basis. She never saw anything inappropriate between defendant and the children. The girls were not fearful or distant with defendant. Aimee was sporadically present at the house. T.K. would be tearful when her mother left the house and went through some separation anxiety.

Defendant moved out of Aimee's residence around 2008. Austin did not notice any change in behavior in the children shortly before defendant moved out. She considered defendant a trustworthy and honest person. She did not see any red flags raised when she saw defendant with any of the kids. Austin thought the accusations against defendant were ridiculous.

### 4. Paul D'Angelo

Paul D'Angelo is married to defendant's niece and he has known defendant for 40 years. D'Angelo considered defendant to be an honest and trustworthy person. He had never seen him do anything inappropriate toward a child. He never felt uncomfortable about having defendant watch his own daughters over the years. He visited defendant in Aimee's home half a dozen times and observed him interacting with Aimee's children. Their interactions were lighthearted and normal. After defendant moved out of Aimee's home, he lived with D'Angelo from 2008 to 2010. When he heard the allegations against defendant, D'Angelo was shocked because it was so out of character for him.

### 5. Penelope Goursau

Defendant's daughter, Penelope Goursau, testified that growing up she lived part of the time with her father. When she was with her father, he never sexually abused her and she always felt safe with him. Defendant never acted inappropriately toward her female friends. She considered her father to be an honest and trustworthy person. Penelope stated that defendant has always been there for her and was a good father. She was completely shocked to find out the allegations against him.

*6.    Detective Whitney*

When called by the defense, Detective Whitney testified that S.C. did not tell him during the police interview that the blinds were closed frequently in the house when the sex acts were occurring. Detective Whitney did not recall whether T.K. told him that her mother was home sometimes when she was being molested. T.K. did not mention that abuse had also occurred in the laundry room or that defendant used a condom during the sex acts. During J.A.'s interview, she told the officer that S.C. was present with the other girls during the abuse at least three or four times. S.C. told Detective Whitney that she was never with J.A. when J.A. was sexually abused. S.C. also stated that she refused to orally copulate defendant, but she did not mention that defendant had tried to insert his penis into her vagina three times. Detective Whitney indicated that in his experience he had never seen a sexual assault victim get the details of an incident exactly the same at the police interview as on the stand when they are testifying.

Detective Whitney did not interview the neighbors or look at the girls' school records or social services records. He did not talk to other people who were living in the house at the time the alleged abuse occurred. Detective Whitney confirmed that defendant turned himself in to the Vallejo Police Department.

## II. DISCUSSION

### A.    *Denial of Motion for Continuance*

*1.    Background*

Prior to trial, S.C. was interviewed by Eric Charm, the former district attorney handling the case. S.C. told Mr. Charm that when she was 12 years old, in addition to being molested by defendant, she had been sexually molested by another male adult. The defense was not given the alleged perpetrator's name until shortly before trial and raised this discovery issue with the court before opening statements were heard. Mr. Ganz, the current deputy district attorney handling the case, explained to the trial court why the new information about S.C. had not been disclosed until recently. Apparently, Mr. Charm had informed the former public defender, Ms. Berliner, that during a meeting with S.C., S.C. had indicated she had also been molested by another individual. Mr. Charm told

10

Ms. Berliner that the district attorney's office would investigate the matter. However, after the information was forwarded to the district attorney investigator, nothing occurred. One week prior to the trial, the current defense counsel, Ms. Johnson, spoke with Mr. Ganz about what had happened with the investigation. At that point, Mr. Ganz learned nothing had been pursued by the investigator.

S.C. testified at an evidentiary hearing that she had been sexually molested by an individual named David Shook when she was 12 years old. David Shook was the father of her friend and the assault occurred in his home when no one else was present. S.C. stated that David Shook penetrated her with his penis one time. The sexual abuse by defendant had occurred one year before the incident with David Shook. S.C. never reported David Shook to the police.

At the evidentiary hearing, defense counsel expressed her concerns to the court that there may be discovery out there that she did not know about. The court responded that the district attorney was not required to transcribe every interview they conduct, and it did not appear that the prosecution had failed to turn over any *Brady*-type of material with respect to newly discovered information about S.C.

One week prior to trial, after obtaining David Shook's name and out-of-state contact information, the defense interviewed him on the phone. David Shook adamantly denied ever having sexual intercourse with S.C. He said that he had lived on the same street as Aimee's home, but he and his family moved to Texas after his daughter, Ashley, finished the fifth grade. David Shook suggested that defense counsel speak with Ashley. Ms. Johnson spoke with 19-year-old Ashley, who said that she had visited Aimee's home almost every day after school and spent time with T.K. and S.C. Ashley maintained that she had never seen defendant act inappropriately with T.K. or S.C. She added that S.C. and other friends had sleepovers at Ashley's house where they slept in her living room. Ashley indicated that she was always with S.C. whenever she came to the Shook house, except for brief instances, such as when using the bathroom.

During the next several days, defense counsel made efforts to secure the Shooks' appearance but was not successful. On the next trial date, which was also the last day of

the prosecution's case, the defense requested a continuance of the case or a mistrial. Defense counsel explained that she could not get an out-of-state subpoena served in time to require the Shooks' appearance at trial. The Shooks had declined to appear at trial voluntarily, due to their school and work schedules, but they said they would honor a subpoena. Defense counsel told the court that if David Shook testified, he would deny he engaged in any inappropriate conduct with S.C. Additionally, Ashley would testify that she was at Aimee's home almost every day and never saw defendant act inappropriately with any of the girls, and that S.C. was never alone with her father when she visited the Shook house. The defense argued this was critical evidence that tended to impeach S.C.'s credibility. As such, a continuance of the trial to secure the Shooks' appearance or a mistrial was justified. The prosecution argued that there was no violation of discovery orders because no investigation of David Shook was conducted and therefore no information was purposefully withheld to justify a continuance. The prosecution also noted the defense could have interviewed S.C. on their own, learned about the presence of Ashley at Aimee's home from defendant, or sought to subpoena the Shooks immediately after they discovered the information. The prosecution added that David Shook's testimony related to S.C. did not particularly impeach her because, generally, anyone accused of molestation would deny it. As such, David Shook's denial was not probative of whether S.C. had fabricated the allegation against him or defendant. Further, for the court to wait for out-of-state subpoenas to issue and then conduct a trial within a trial to determine whether the allegation against Shook was true or not would cause unreasonable delay.

In denying the motion for a continuance or mistrial, the court concluded that the purported evidence sought through David and Ashley Shook was substantially more prejudicial than probative under Evidence Code section 352. The court also recognized that if David Shook testified he would deny the molestation allegation and likely invoke the 5th Amendment. To help resolve the issue, the court suggested that the parties reach a stipulation as to what David Shook would testify if he appeared in court. The parties agreed to the following stipulation that was ultimately read to the jury: "Months before

12

this trial began, [S.C.] mentioned to the prior Deputy D.A. handling this case that this was not the first time that she was the victim of a sexual assault. Right before this trial, she testified briefly about this prior incident indicating that she was around 12 years old and an adult male had sexual intercourse with her. The alleged perpetrator of that assault was contacted by investigators for the defense. If he testified, he would deny that he ever had sexual intercourse with [S.C.]." However, the court denied any evidence or stipulation related to what Ashley would testify to because it was not known what she was going to say or what she saw.

In a subsequent motion for a new trial, the defense challenged the trial court's denial of a continuance, emphasizing that the testimony of Ashley Shook was critical in casting doubting on defendant's guilt. The defense indicated that following the verdicts, two jurors had expressed that they would have found it helpful to have heard from another child who frequented Aimee's home. However, the defense failed to submit a sworn declaration from those jurors in support of the new trial motion. The trial court found that the defense had not established that Ashley's testimony would have benefitted defendant such that the jury would have likely reached more favorable verdicts. Thus, the court denied the motion, concluding that Ashley Shook's proffered testimony was neither credible nor material: "I don't believe that the defendant has made any showing that the Court abused its discretion or erred in denying the continuance. In my view the defendant has not demonstrated adequately that [Ashley] Shook possessed credible or material testimony concerning the defendant's actions."

### 2. *Analysis*

Defendant now contends that the trial court violated his right to due process in denying his request for a continuance. We review a trial court's ruling denying a continuance for abuse of discretion. (*People v. Sakarias* (2000) 22 Cal.4th 596, 646.)

In order to obtain a continuance to secure the attendance of a witness in a criminal case, the defendant must establish: (1) the exercise of due diligence in attempting to bring the witness to court; (2) the ability to obtain the witness's testimony within a reasonable time; (3) the unavailability of other evidence establishing the facts to which the witness is

13

expected to testify; and—most significantly for our purposes—(4) the materiality of the witness's testimony. (*People v. Howard* (1992) 1 Cal.4th 1132, 1171.)

With respect to the testimony of David Shook,[2] even assuming arguendo that it met the first three of these criteria, defendant's assertion that David's in person testimony was material is unconvincing. The substance of the proffered testimony, namely his denial that he molested S.C., was presented to the jury in the form of the stipulation. Defendant asserts that this " 'sterile' " recitation of David's proposed testimony paled in comparison to the testimony of a live witness. Even if the proffered testimony had been presented by a live witness, its substance was only tangentially relevant to the issues at trial. First, any evidence that David molested S.C. did not bear on whether defendant committed lewd acts against her. Second, to the extent David's testimony had some minimal relevance to impeaching S.C.'s credibility, a determination of whether David molested S.C. would have required a trial within a trial, thus, leading to an undue consumption of time, creating a substantial danger of confusing the issues and misleading the jury. In other words, the trial court properly applied Evidence Code section 352 and acted well within its discretion in denying the motion for a continuance as it related to the proposed testimony of David Shook.

Similarly, the court did not abuse its discretion in denying the continuance as it related to Ashley Shook. Defendant contends Ashley's testimony would have impeached S.C.'s testimony as it related to her allegations against her father, as well as the allegations against defendant. However, as discussed, whether David molested S.C. was not material to the issue of whether defendant molested her. Accordingly, in this regard, Ashley's testimony about her father's conduct was similarly irrelevant.

Defendant next argues that Ashley's proffered testimony would have impeached S.C.'s testimony and undermined the testimony of T.K. and J.A. Even assuming for the sake of argument that defendant exercised due diligence in attempting to bring Ashley to

---

[2]    Inasmuch as our discussion involves two members of the Shook family, we shall refer to David and Ashley Shook by their first names for purpose of clarity and intend no disrespect.

court, other defense evidence, namely the numerous character witnesses, was introduced to discredit the testimony of the girls.

Indeed, the proffered testimony was cumulative insofar as two other defense witnesses testified that they were routinely present in Aimee's home and never saw defendant act inappropriately with the girls. For example, Mavis Austin testified that she lived across the street from Aimee's home, and for three years, she went to Aimee's home practically every day. Austin saw T.K. and S.C. almost on a daily basis and saw J.A. frequently when J.A. was visiting, and she had never observed anything inappropriate between defendant and the girls. Similarly, defendant's son, Shannon, testified that he lived in Aimee's home anywhere from three months to one year during which time he saw T.K., S.C., and J.A. frequently. Shannon indicated that he did not observe anything unusual between his father and the girls.

Defendant also presented other character witnesses, long-time friends, who had frequently visited defendant in Aimee's home and testified that his interactions with the girls were normal, and who vouched for his honesty and trustworthiness. Thus, under the circumstances, it was reasonable to conclude that the burden on the parties and the jury that would have resulted from a delay in the proceedings to secure Ashley's testimony far outweighed any potential benefit to the defendant. Accordingly, the trial court did not abuse its discretion in denying defendant's motion for a continuance.

Finally, any error in not continuing the trial to secure Ashley's testimony was harmless under any standard. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson* (1956) 46 Cal.2d 818, 836.) Here, all of the counts related to S.C. were either dismissed by the court as a result of a hung jury, or on the prosecution's motion. Based on the overwhelming evidence against defendant on the charges related to T.K. and J.A., the jury would have still convicted defendant of those counts. The strong similarities between T.K. and J.A.'s accounts provided mutual corroboration. As such, T.K. and J.A.'s testimonies about defendant's continuous abuse would not have been materially impeached by Ashley's statement that she did not see anything inappropriate when other defense witnesses who frequented Aimee's home testified in the same manner.

15

Moreover, the strength of the prosecution's case is reflected by the fact that the jury returned a guilty verdict on all 40 counts related to T.K. and J.A. Any doubts the jury may have had involved the counts related to S.C., on which they ultimately could not reach a verdict. Therefore, the admission of Ashley's testimony would not have led the jury to reach different verdicts with respect to T.K. and J.A.

## B. Exclusion of Evidence

### 1. Background

Defendant contends the trial court erred in excluding evidence that J.A. had robbed several people when she was 13 years old, which was at the same time of the alleged molestations by defendant. The proffered evidence included J.A.'s admission that she had robbed an Asian girl of a PSP Player (a portable video game player) and her denial that she posted a statement on her MySpace page that she was robbing Chinese people. Defendant also sought to introduce evidence that J.A. had shoplifted at Nordstrom's and Macy's in 2010, when she was 16 or 17 years old. J.A. made the molestation allegations against defendant in 2010 at age 16, and testified at trial at age 18. The trial court excluded the evidence of J.A.'s conduct at age 13 as too remote to be relevant, and as substantially more prejudicial than probative under Evidence Code section 352, but permitted the evidence of shoplifting when J.A. was 16. In so ruling, the court explained: . . . with reference to [J.A.] and her conduct back in '07 and 2010 and 2010 [*sic*], I'm not going to allow the defense to put on the evidence of the older 211 arrest, which resulted in some kind of adjudication for a 496. Basically, I don't think it's particularly relevant, a 13-year-old conducting herself in that regard. I just think under 352, it's not particularly probative and it's prejudicial. So I'm not going to allow it. So the defense request to put evidence on of that 07/2011 arrest resulting in a 496 is going to be denied. . . . [¶] I also think–you know, I mentioned that he could put on an expert, which apparently he chooses not to do, if I allowed it in, to explain it away. But I think, based on a certain amount of experience, from doing a lot of jury trials, it's almost common knowledge that an expert can be hired for $250 an hour and come in here and say, " 'Well, yeah, she acted out. Maybe she stole something, maybe she beat someone

16

up, maybe she received stolen property at age 13, but she was acting out because, well, she had been molested.  And that is a standard modus operandi or symptom of somebody who has been molested.'  [¶] So I think it cuts both ways.  It's not particularly relevant.  [¶] With reference to the January 17th 459 second or 484, whatever it is, at Macy's and the June, 2010, 484 at Nordstrom's, I think that's more recent in time and is relevant to her credibility regarding her testimony here in court.  [¶] [S]o with an appropriate instruction, I'll allow that."

> 2.    *Analysis*

According to defendant, the challenged evidence would have impeached J.A.'s credibility given that robbery is an act involving moral turpitude and demonstrates that even at age 13 she was a dishonest person capable of making false accusations as she grew older.  He claims the exclusion of this evidence violated his constitutional right to confront and cross-examine witnesses and to present all relevant evidence.

First, the trial court has broad discretion under Evidence Code section 352 to assess "whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time." (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.)  Second, as a general matter, "application of the statutory rules of evidence does not impermissibly infringe upon a defendant's due process rights.  (See *People v. Lucas* (1995) 12 Cal.4th 415, 464; *People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103.)  [¶] 'In particular, notwithstanding the confrontation clause, a trial court may restrict cross-examination of an adverse witness on the grounds stated in Evidence Code section 352.' (*People v. Quartermain* (1997) 16 Cal.4th 600, 623.)  ' "[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. [Citation.]" [Citations.]  The confrontation clause allows "trial judges . . . wide latitude . . . to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.' [Citation.]  In other words, a trial court may restrict cross-examination on the basis of the well-established

17

principles of Evidence Code section 352, i.e., probative value versus undue prejudice. [Citation.] There is no Sixth Amendment violation at all unless the prohibited cross-examination might reasonably have produced a significantly different impression of credibility.' (*People v. King* (2010) 183 Cal.App.4th 1281, 1314-1315, fn. omitted; see also *People v. Hillhouse* (2002) 27 Cal.4th 469, 494 . . . .)" *People v. Ardoin* (2011) 196 Cal.App.4th 102, 119.)

Here, we see no abuse of discretion and no violation of defendant's right to confrontation and cross-examination. The trial court found that due to the remoteness of the events of the juvenile offense, the probative value was significantly diminished. As the court noted, J.A.'s alleged misconduct at age 13 could have been a form of acting out because she was molested. As such, the evidence was not necessarily probative of dishonesty, and had the potential to confuse or mislead the jury. Given the remoteness in time and its low probative value, the court properly excluded the evidence under Evidence Code section 352 as substantially more prejudicial than probative. Defendant has thus failed to demonstrate that the trial court acted in an " 'arbitrary, capricious, or patently absurd manner.' " (*People v. Rodrigues, supra,* 8 Cal.4th at pp. 1124-1125.) Because the trial court did not abuse its discretion under the ordinary rules of evidence, the exclusion of the evidence did not implicate defendant's constitutional rights. (*People v. Marks* (2003) 31 Cal.4th 197, 226-227.) Therefore, defendant's claim that his rights to confront witnesses and present all relevant evidence necessarily fails.

## C.    *Failure to Give a Unanimity Instruction*

Defendant was charged with 56 counts of child molestation (20 against T.K., 20 against J.A., and 16 against S.C.). Subsequently, the prosecution dismissed eight of the counts involving S.C., and the jury could not reach a verdict on the remaining eight counts.[3] The trial court did not give either a standard specific acts unanimity instruction,

---

3    The prosecution then dismissed the remaining eight counts involving S.C.

18

such as Judicial Council of California Criminal Jury Instructions, CALCRIM No. 3500,[4] or a modified unanimity instruction, such as CALCRIM No. 3501.[5] Defendant now contends the trial court's failure to give a sua sponte unanimity instruction requires reversal.

In a criminal case, the jury must agree unanimously the defendant is guilty of a specific crime. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) When "the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act. [Citations.]" (*Ibid.*) In child sexual molestation cases involving minors and repeated identical offenses, the unanimity rule has been refined. (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 556.) In such cases, although the jury may not be able to readily distinguish between the various acts, it is certainly capable of unanimously agreeing that they took place in the number and manner described. (*People v. Jones* (1990) 51 Cal.3d 294, 321 (*Jones*).)

Our supreme court explained in *Jones* that "even generic testimony describes a repeated series of *specific,* though indistinguishable, acts of molestation. [Citation.] The unanimity instruction assists in focusing the jury's attention on each such act related by the victim and charged by the People. We see no constitutional impediment to allowing a

---

[4]     CALCRIM No. 3500 provides: "The defendant is charged with *<insert description of alleged offense>* [in Count] [sometime during the period of __ to __] ¶] The People have presented evidence of more than one act to prove that the defendant committed this offense. You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act (he/she) committed."

[5]     CALCRIM No. 3501 provides: "The defendant is charged with *<insert description[s] of alleged offense[s]>* [in Count[s]] sometime during the period of __ to __. [¶] The People have presented evidence of more than one act to prove that the defendant committed (this/these) offense[s]. You must not find the defendant guilty unless: [¶] 1. You all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act (he/she) committed [for each offense]; [¶] OR [¶] 2. You all agree that the People have proved that the defendant committed all the acts alleged to have occurred during this time period [and have proved that the defendant committed at least the number of offenses charged]."

jury, so instructed, to find a defendant guilty of more than one indistinguishable act, providing the three minimum prerequisites heretofore discussed are satisfied." (*Jones, supra,* 51 Cal.3d at p. 321.) The three prerequisites include generic evidence describing (1) the type or kind of acts committed, (2) the number or frequency of the acts committed, and (3) the general time period in which these acts occurred. (*Id.* at p. 316.)

Here, there was generic testimony describing a repeated series of specific, though indistinguishable, acts of molestation which occurred over a span of several years. The court should have given an instruction based on CALCRIM No. 3501—providing instruction on unanimity when there is generic evidence of the charged offenses. Nevertheless, when the jury resolves a basic credibility dispute against the defendant and therefore would have convicted him of any of the various offenses shown by the evidence, the failure to give the unanimity instruction is harmless. (*People v. Matute* (2002) 103 Cal.App.4th 1437, 1449-1450; see also *Jones*, *supra,* 51 Cal.3d at pp. 321-322.)

There is a split of authority on whether the error must be harmless beyond a reasonable doubt or whether it is reasonably probable the defendant would have achieved a more favorable result had the instruction been given. (*People v. Milosavljevic* (2010), 183 Cal.App.4th 640, 647; *People v. Smith* (2005) 132 Cal.App.4th 1537, 1545.) Under either standard, we conclude the failure to give the instructions was harmless. As explained in *Jones, supra,* 51 Cal.3d 294, omission of a unanimity instruction is harmless "if the record indicated the jury resolved the basic credibility dispute against the defendant and would have convicted the defendant of *any* of the various offenses shown by the evidence to have been committed. [Citations.]" (*Id.* at p. 307; see also *People v. Arevalo-Iraheta* (2011) 193 Cal.App.4th 1574, 1589.) *People v. Thompson* (1995) 36 Cal.App.4th 843, set forth this principle, as follows: "Where the record provides no rational basis, by way of argument or evidence, for the jury to distinguish between the various acts, and the jury must have believed beyond a reasonable doubt that defendant committed all acts if he committed any, the failure to give a unanimity instruction is harmless. [Citation.] Where the record indicates the jury resolved the basic credibility

20

dispute against the defendant and therefore would have convicted him of any of the various offenses shown by the evidence, the failure to give the unanimity instruction is harmless. [Citation.]" (*People v. Thompson, supra,* 36 Cal.App.4th at p. 853.)

This is such a case. Although defendant argues that individual jurors may have disagreed upon the type of sex acts that occurred (i.e., vaginal fondling, oral copulation, manual masturbation, digital penetration), there is no affirmative evidence showing that he engaged in some but not all of the molestations. Instead, defendant presented a unitary defense with respect to the multiple counts of molestation. Defense counsel sought to attack the credibility of the victims and to portray defendant as an honest and trustworthy person who never exhibited inappropriate behavior around children. The jury clearly rejected this defense when it convicted defendant of all 40 counts against T.K. and J.A. Thus, there was no basis in the evidence or arguments for the jury to have distinguished among the types of offenses and the jury resolved the basic credibility dispute against defendant.

For these reasons, we hold that omission of a unanimity instruction was harmless beyond a reasonable doubt. (*People v. Curry* (2007) 158 Cal.App.4th 766, 783 [omission of unanimity instruction harmless beyond reasonable doubt]; *People v. Arevalo–Iraheta, supra,* 193 Cal.App.4th at pp. 1589-1590 [same].)

21

## III. DISPOSITION

The judgment is affirmed.


_____
REARDON, J.


We concur:


_____
RUVOLO, P. J.


_____
RIVERA, J.